# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6620 | **DATE** | 3/7/2002 |
| **CASE TITLE** | | Valencia Hicks vs. Jo Ann Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the memorandum opinion and order, both parties' Rule 56 motions for summary judgment are denied (3-1), but Hicks' alternative motion for remand is granted. As a final note, this Court urges Commissioner to transfer this case to another ALJ on remand to ensure a fair review of all of the evidence presented by the record (see id.).

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | number of notices | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | MAR 08 2002 | | | |
| ✓ | Docketing to mail notices. | | | docketing deputy initials | | |
| ✓ | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | | | |
| | SN courtroom deputy's initials | 02 MAR -7 PM 5: 12 U.S. DISTRICT COURT | Date/time received in central Clerk's Office | date mailed notice | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VALENCIA HICKS for RAYMONT HICKS, SSN: 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, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 01 C 6620 |
| JO ANNE BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Valencia Hicks ("Hicks"), on behalf of her son Raymont, seeks judicial review pursuant to the Social Security Act ("Act," more specifically 42 U.S.C. §§416(i), 423 and 1381(a)[1]) of the final decision of Commissioner of Social Security Jo Anne Barnhart ("Commissioner") denying Raymont's application for supplemental security income ("SSI") disability benefits under Section 1381(a). As is usual in these cases, both sides have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56. In the alternative Hicks has moved for a remand for further proceedings. For the reasons stated in this memorandum opinion and order, both parties' Rule 56 motions for summary judgment are denied, but Hicks' alternative remand request is granted.

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --." Finally, citations to Hicks' and Commissioner's respective memoranda take the form "H. Mem. --" and "C. Mem. --."

## Procedural Background[2]

On December 15, 1997 Raymont filed an application for SSI disability benefits due to learning disability (R. 66). That application was denied both initially and on reconsideration (R. 36, 37). Raymont then requested and received a hearing (the "Hearing"), which took place before Administrative Law Judge ("ALJ") Christine Holtz on December 8, 1999 (R. 24).

On January 3, 2000 the ALJ issued a decision denying Raymont's request for disability benefits (R. 13). That was based on the ALJ's finding that while Raymont had a severe developmental reading disorder, he did not meet the criteria for disability laid out in Reg. §404, Subpt. P, App. 1 ("App. 1")(R. 22).

Raymont's timely request for review before the Appeals Council was denied on June 29, 2001 (R. 5). On August 24, 2001 Hicks filed this action pursuant to Section 405(g).

## Facts

Raymont was born on March 31, 1988 (R. 29). At the time of the December 1999 Hearing, he was a sixth-grader in a learning-disabled class (R. 30-31). Raymont testified that reading was the most difficult academic subject for him and that he received extra help with it (R. 29). He also testified that he never saw any of his friends outside of school (R. 30).

---

[2] What follows in the next sections of the text is drawn from the administrative record (cited "R. --").

Hicks testified that according to Raymont's teacher he daydreams in class, does not pay attention and needs help with his reading skills (R. 31). She also testified that Raymont did not remember to do household chores and that he constantly fought with his siblings (id.)

In addition to that testimony ALJ Holtz received written evidence in three general categories: school records, medical records and family reports. That added evidence will be outlined next.

School Records

Raymont's school records included a Multidisciplinary Conference Summary Report completed by his teacher and other school staff on February 21, 1997 when he was in the third grade. That Report noted that "[a] significant discrepancy appears evident between Raymont's average cognitive functioning and achievement with regard to written expression, basic reading and reading comprehension" (R. 73). It went on to say that Raymont experienced (R. 75):

> academic delays despite apparent effort and
> interventions. Cognitive functioning indicates average
> verbal abilities coupled with borderline nonverbal
> ability & relative and significant weaknesses in visual
> reasoning & sequencing. Expectancy is at a 3.0 level.
> Achievements ranged from 1.3 to 2.0 in language arts
> skills. Math skills are better developed and range
> from 2.9 to 3.3.

It was consequently recommended that Raymont be placed in a

special education classroom for 50% or more of the day (R. 77).

Raymont was reevaluated the next year and found still to be in need of special education (R. 92). At that time it was observed that he had "poor attention span, time on task and lack[ed] motivation"(R. 86). Later in that same academic year, Raymont's teacher completed a School Activities Questionnaire that reported he was functioning at a first grade level and said (R. 70):

> Raymont doesn't feel that he has to attend to directions. He wants to do things his way. Raymont cannot read written instructions and does not follow oral directions. He needs to be motivated to complete assignments. If the teacher sits with Raymont and encourages him to do his items, Ray will work. Ray has never been trained to work independently.

Raymont's fifth grade teacher completed the same questionnaire in May 1999. At that time she reported that Raymont was functioning at a fourth grade level in his learning- disabled class (R. 124). He worked very slowly, requiring frequent assistance and structure for all academic activities (id.). To reduce distractions, his desk had been placed between two filing cabinets (id.).

Finally, another school report from November 1999--when Raymont was in the sixth grade--indicated that he was reading at the 2.5 grade level, spelling at the 2.3 grade level and doing arithmetic at the 4.3 grade level (R. 170). He had difficulty answering questions both after reading a selection and in using

4

correct vocabulary related to math skills (R. 172). His attention span was short and he had negative social behavior with his peers (R. 173). That report went on to say that Raymont processed information slowly, had a short auditory attention span, was easily distracted (often losing focus and concentration), had trouble putting ideas on paper, had difficulty understanding concepts, had difficulty following multiple verbal requests, was frequently distracted by extraneous noises and was slow to switch from one task to another (R. 177).

To accommodate those learning characteristics a number of curricular modifications were recommended, including extending his time to complete tasks, reducing his work load and allowing for extra credit, giving simple oral directions in clearly stated steps with concrete examples, testing one concept at a time with multiple choice instead of essay tests, providing visual aids and providing motivation and oral rewards on a daily basis (R. 177). Finally, the report also recommended that Raymont remain in a special education classroom for the next school year (R. 176).

Medical Records

Psychologist Dr. Norman Kerr evaluated Raymont in February 1999 and concluded that he had a developmental reading disorder, with a formal diagnosis of learning disorder (R. 149). Dr. Kerr found that Raymont was mentally oriented and in contact with reality but at the same time not very bright, verbal or well-

informed (R. 148). Raymont's vocabulary, level of comprehension, quality of communication, attention span and concentration were all below average for his age (id.).

In tests administered by Dr. Kerr, Raymont obtained a reading score in the middle second grade level, a spelling score in the upper first grade level and an arithmetic score in the middle second grade level (id.). Dr. Kerr did note that Raymont's performance on the arithmetic test was "somewhat unfocused," suggesting that his true achievement was slightly higher than suggested by that result (id.). Raymont's intelligence test score was 86--within the normal range (id.). Dr. Kerr found a significant discrepancy between Raymont's achievements and his cognitive ability with respect to reading, spelling and arithmetic (id.).

Based on those results, Dr. Kerr concluded that Raymont had a developmental reading disorder that was not explainable by mental retardation or inadequate schooling and was not due to a perceptual defect or neurologic disorder (R. 149). More formally, Dr. Kerr diagnosed Raymont's condition as "a learning disorder characterized by a discrepancy of more than 2 standard deviations between his level of achievements and his IQ" (id.). In Dr. Kerr's opinion, Raymont's medical condition was medically equivalent to SSI listing 112.02 ("Listing 112.02") for an Organic

Mental Disorder[3] because of his low reading scores coupled with a marked limitation in his cognitive/communicative area and a marked impairment in concentration, persistence or pace (R. 141-42).

Next, Barbara Sherman ("Sherman"), a licensed clinical psychologist, examined Raymont on May 17, 1999 (R. 151). Sherman diagnosed him as mentally retarded after he received a score of 65 on an intelligence test (R. 151, 154).[4] Raymont was not consistently cooperative, however, and Sherman concluded that the results probably did not fully reflect his current level of cognitive functioning (R. 152). Sherman's examination also showed Raymont to have severe learning disabilities (R. 154).

On the same May 17, 1999 date, Raymont also met with Dr. Harley Rubens, a psychiatrist who interviewed Raymont and his mother and reviewed Dr. Kerr's report (R. 155). Dr. Rubens reported that Raymont's memory, attention and concentration were good, as were his mathematical calculations (R. 156). He noted the reports of Raymont's difficulties with reading and stated a diagnosis of "rule out developmental reading disorder," but that somewhat cryptic statement is hard to decipher because Dr. Rubens went on to say that Raymont's "disability with reading may indicate the developmental reading disorder" (R. 157).

---

[3] See Appendix.

[4] Intelligence test scores lower than 70 are considered indicative of mental retardation.

7

On June 3, 1999 two state medical experts reviewed the reports of Sherman and Dr. Rubens, along with the April 1999 Daily Activities Questionnaire and the May 1999 school report (R. 161). They concluded that Raymont had a learning disability and developmental reading disorder and that those impairments, although severe, fell short of meeting or equaling the severity required to qualify for SSI benefits (R. 158). That conclusion, however, was reached entirely without consideration of Dr. Kerr's report and the other school records--an omission that is without explanation in the record.

Family Reports

Hicks reported in a November 1998 Function Report that Raymont was unable to deliver telephone messages, repeat stories, explain why he did things or talk with friends (R. 104). He was also unable to read simple words, read and understand simple sentences or stories, write in longhand or write a simple story of six to seven sentences, and he did not know the days of the week and months of the year or how to tell time on a non-digital clock (R. 105). She reported that he had no friends at all and was unable to make new friends (R. 107). According to Hicks, Raymont could not button his clothes, tie shoelaces, comb, brush or wash his hair, choose his clothes, eat using a knife, fork and spoon, hang up his clothes, help around the house, obey safety rules or accept criticism or correction (R. 108). He also did not finish

things he started, complete his homework or complete his chores most of the time (R. 109).

On April 10, 1999 Hicks stated in a Reconsideration Disability Report that Raymont "can't go anywhere by himself. He gets lost right around the corner from his own home" (R. 135).

Hicks also completed a Childhood Function Report on April 26, 1999 in which she said Raymont could not tell time on a regular clock, repeat stories accurately, explain why he has done things, take telephone messages, count money, subtract numbers over 10 or communicate complete thoughts (R. 129). She reported that he had friends but fought with them every day, and he had difficulty paying attention to her or his teacher (id.). Moreover, Raymont could not care for himself without supervision, prepare simple snacks or complete household chores (R. 130). Hicks also reported that he was unable to complete tasks that he began, had difficulty waiting his turn, acted restless and was easily distracted (id.).

### ALJ Holtz' Opinion

ALJ Holtz reviewed the submitted evidence and found that while Raymont had a severe developmental reading disorder, he did not meet the criteria for disability (R. 22). After noting that medical experts had advanced three different diagnoses for Raymont (learning disability, mental retardation and developmental reading disorder), she concluded based on "the objective evidence of record" that it was "reasonable to adopt the diagnosis of a

9

developmental reading disorder" (R. 19). She explained that
decision on the basis that Raymont had scored significantly higher
in a number of intelligence tests he took before the test
administered by Sherman, which had been the sole basis for the
mental retardation diagnosis (id.). She also found (id.):

> a diagnosis of developmental reading disorder is
> somewhat more accurate than the generalized diagnosis
> of "learning disability," since the claimant, despite
> poor performance, has demonstrated the ability to work
> at or near grade level in mathematics.

ALJ Holtz agreed with the state experts that Raymont did not
meet or equal any of the listed impairments. Although she
recognized that Dr. Kerr had expressed a different opinion in his
evaluation, she found that Dr. Kerr's conclusions were "not
supported by the record as a whole, including Dr. Kerr's own
personal observations" (id.). In particular she observed that Dr.
Kerr reported Raymont to be "somewhat unfocused" during the
arithmetic test, that he was "impassive, nonchalant or casually
indifferent to the situation he found himself in" and that he was
"poorly motivated, bored, and slow in his reactions" during the
intelligence test (id.). In the ALJ's opinion that information
"appear[ed] to contradict Dr. Kerr's ultimate conclusions that the
claimant is impaired by an <u>organic</u> learning disorder which, in the
end, purportedly markedly limits his cognitive functioning" (id.,
emphasis in original).

In assessing whether Raymont's impairments functionally

10

equaled the criteria for any SSI listing, ALJ Holtz concluded that
he showed less-than-marked limitations in cognitive/communication
functioning and concentration, persistence or pace (R. 21). To
support those conclusions she cited several specific pieces of
evidence that were before her. In so doing she identified various
inconsistencies in the reports that Hicks had given about
Raymont's behavior and ability to function, concluding that she
was not a fully credible witness (id.).

Ultimately the ALJ found (1) that Raymont had never engaged
in substantial gainful activity, (2) that he had the "severe"
impairment of developmental reading disorder, (3) that he did not
have a listed impairment or one medically equal to a listed
impairment, (4) that he did not have an impairment that
functionally equaled a listed impairment, (5) that Hicks'
subjective accounts were not fully credible and (6) that Raymont
was not under a disability at any time through the date of the
decision (R. 22). ALJ Holtz therefore denied Raymont's
application for SSI benefits.

## Applicable Law

Judicial review of Commissioner's decision, authorized by
Section 405(g), requires that her findings of fact must be upheld
if they are supported by substantial evidence. Such review is
therefore limited to determining (1) whether Commissioner applied
the correct legal standards in reaching the decision and (2)

whether there is substantial record evidence to support the findings (<u>Clifford v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000)).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (<u>Kepple v. Massanari</u>, 268 F.3d 513,516 (7th Cir. 2001), quoting from <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). This Court's review of Commissioner's determination must examine the entire administrative record but may not reweigh the evidence, resolve conflicts, decide credibility questions or substitute its judgment for Commissioner's (<u>Clifford</u>, 227 F.3d at 869). That does not, however, call for an uncritical rubber-stamping of Commissioner's decision (<u>id</u>.).

To be found disabled under Commissioner's regulations, a child must meet or equal (either medically or functionally) the requirements of an impairment listed in App. 1 (Reg. §416.924). Those regulations create a three-step analysis for evaluating a child's impairment and determining disability:

1. First Commissioner must look to whether the child was performing substantial gainful activity (Reg. §416.924(b)).

2. If the child was not, Commissioner must next determine whether the child has a severe impairment or

combination of impairments (Reg. §416.924(c)).[5]

3.  If the answer at step two is "yes," the final step
is to determine whether the impairment meets or equals an
impairment listed in App. 1 (Reg. §416.924(d)). If so, the
child is disabled (Reg. §416.924(d)(1)). If not, all of the
listings must be considered to decide whether the child's
functional limitations are equal in severity to the
functional limitations in any listing (Reg. §416.926a(a)).
That degree of severity requires that the child have marked
limitations in two domains of functioning or an extreme
limitation in one domain (id.).[6] If Commissioner finds the
child meets either standard, the child is disabled.[7]

---

[5]  To simplify the following discussion, only a single
impairment will be assumed. Of course the analysis would be the
same if a combination of impairments is present.

[6] Commissioner defines a "marked" limitation as an impairment
that "interferes seriously with your ability to independently
initiate, sustain, or complete activities" (Reg. §416.926a(e)(2)).
"Extreme" limitations occur with impairments that "interfere[ ]
very seriously with your ability to independently initiate,
sustain, or complete activities (Reg. §416.926a(e)(3), emphasis
added). Commissioner's domains of functioning are (1) acquiring
and using information, (2) attending and completing tasks, (3)
interacting and relating with others, (4) moving about and
manipulating objects, (5) caring for oneself and (6) health and
physical well-being (Reg. §416.926a(b)(1)).

[7] At the time of ALJ Holtz's decision, slightly different
interim rules were in place for the determination of functional
equivalence. On January 2, 2001 the final rules outlined in this
opinion became applicable to all claims then pending at any stage
in the administrative review process, including judicial appeals
(Hickman v. Apfel, 187 F.3d 683, 688 (7th Cir. 1999)). Both
parties agree that the basic standard for determining functional

## Analysis of the ALJ's Decision

Raymont argues that ALJ Holtz erred when she (1) substituted her lay opinion as to the significance of the psychological testing for that of medical professionals and (2) failed to consider all of the evidence before reaching her conclusions. Because Raymont is correct on both counts, this case must be remanded for further proceedings.

SSI claimants are not entitled to disability benefits simply because their physicians have opined that their impairments meet a particular listing (<u>Dixon v. Massanari</u>, 270 F.3d 1171, 1177 (7th Cir. 2001)). Under Social Security regulations, Commissioner is charged with making the ultimate determination of disability (Reg. §404.1527(e)). But in acting for Commissioner in that respect, an ALJ must at least "minimally articulate [her] reasons for crediting or rejecting evidence of disability" (<u>Scivally v. Sullivan</u>, 966 F.2d 1070, 1076 (7th Cir. 1992)) and "build an accurate and logical bridge between the evidence and the result" that she reaches (<u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (7th Cir. 1996)). Finally, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings" (<u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996)).

Thus even though the ALJ was not required to accept Dr.

---

equivalence remains unchanged from the interim rules used by ALJ Holtz (C. Mem. 9, H. R. Mem. 4). On remand the final rules will apply (see 65 Fed. Reg. at 54,751).

Kerr's conclusion that Raymont met Listing 112.02, she could not reject that opinion without articulating her reasoning in an accurate and logical manner. ALJ Holtz did provide reasons for rejecting Dr. Kerr's finding, explaining that she found his conclusion was not supported by the record as a whole, including his own observations (R. 19). But in doing so the ALJ relied solely on her own interpretation of the medical evidence and made several conclusions that had no support in the evidence before her. No medical expert was present at the Hearing, and no medical expert has ever reviewed all of the evidence submitted in this case.[8] In effect ALJ Holtz made her own independent medical findings.

Even worse, ALJ Holtz made several assumptions about the nature of Raymont's impairment that have no record support. For example, she assumed that a diagnosis of developmental reading disorder was necessarily different from the "generalized" diagnosis of learning disorder (R. 19). That assumption flouts the only medical evidence in the record as to the relationship between the two terms, which was Dr. Kerr's explanation that they are interrelated and that both terms applied to Raymont: He had a developmental reading disorder that resulted in a formal diagnosis of learning disorder (R. 149). ALJ Holtz' adoption of the

---

[8] As pointed out earlier, the state experts never consulted Dr. Kerr's report or many of the school records.

developmental reading disorder diagnosis while rejecting that of a learning disorder was a classic instance of the forbidden "playing doctor," for it was done in the absence of any supporting medical evidence.

Similarly, no record medical evidence supports ALJ Holtz' rejection of Dr. Kerr's diagnosis of learning disorder on the ground that Raymont was working at or near his grade level in mathematics. Learning disorder is properly diagnosed "when the individual's achievement on individually administered, standardized tests in reading, mathematics or written expression is substantially below that expected for age, schooling and level of intelligence" (Diagnostic and Statistical Manual of Mental Disorders 46 (4th ed. 1994)(emphasis added). Thus Raymont's consistently low reading scores could by themselves provide an adequate basis for a diagnosis of learning disorder, regardless of his level of mathematical achievement. Once again the ALJ's rejection of that diagnosis without any medical support for her position was in error.

Finally, when ALJ Holtz found that Dr. Kerr's ultimate diagnosis of learning disorder was purportedly contradicted by his statement that Raymont's intelligence test scores probably did not reflect his potential intelligence (R. 19), she incorrectly assumed that an individual with a learning disorder must also have low intelligence. That analysis completely misconstrues the

meaning of learning disorder, which is not the result of low
intelligence but of a failure to achieve at the level that would
be expected for one's intelligence.[9]

In each of those instances, the ALJ voiced conclusions about
medical matters based on her own conjectures instead of on medical
evidence. And her finding that Raymont did not meet or medically
equal any listing was grounded in those unsupported conclusions.
That alone would be enough to call for remand, but ALJ Holtz
committed additional errors as well.

ALJs must consider all of the relevant evidence presented to
them in making their findings (Rohan, 98 F.3d at 971). At several
points ALJ Holtz failed to do that. For example, her conclusion
that Raymont did not have a marked limitation in concentration,
persistence or pace was based on three pieces of evidence: (1)
Sherman's opinion that Raymont showed "carelessness" as he
completed arithmetic exercises (R. 153),[10] (2) Dr. Rubens'
statement that Raymont's attention and concentration were "good"
during his interview (R. 157) and (3) February 1998 remarks from

---

[9] Indeed, it is entirely plausible that people with low
intelligence may be less likely than people of average or high
intelligence to be achieving at a level substantially below that
expected for their age, schooling and level of intelligence.

[10] ALJ Holtz mischaracterized Sherman's comments as opining
that Raymont showed no marked inability to concentrate or persist
when doing arithmetic (R. 20). In fact Sherman expressed no
opinion on Raymont's concentration, persistence or pace as to
those exercises (R. 153).

17

Raymont's teacher, which ALJ Holtz interpreted as demonstrating that he was stubborn and indifferent toward his schoolwork, not unable to concentrate (R. 84).[11]

But the ALJ was improperly silent about the abundant evidence to the contrary that indicates Raymont does have significant problems with concentration, persistence and pace--problems that may well rise to the level of a marked limitation. For example, Sherman's report said that Raymont's concentration ranged "from intense to fleeting" (R. 152). Even more directly, Dr. Kerr said that Raymont's "attention span and concentration appeared to be below average standards for his age" (R. 148).

And Raymont's school records are filled with comments about his problems on that score. To recap the earlier factual account:

- In February 1997 his teacher referred to a "significant discrepancy" between his "average cognitive functioning and achievement" in reading, writing and reading comprehension (R. 73).

---

[11] ALJ Holtz stated that Raymont was not limited in concentration, persistence and pace at two different points in her opinion: (1) when she found that Raymont did not meet or equal SSI Listing 112.02 and (2) when she determined that his impairment did not functionally equal a listed impairment (R. 20-21). She was wrong to rely on the non-medical evidence from Raymont's teacher in determining that he did not meet Listing 112.02, for "[w]hether a claimant's condition equals a listed impairment is strictly a medical determination" (Hickman, 187 F.3d at 688; see also Reg. §416.926(b)). It was when assessing whether Raymont's impairment was functionally equivalent to a listing that the ALJ was required to consider all relevant non-medical evidence.

- One year later his teacher wrote: "During reading time, Ray will walk around the room for whatever reason. When he returns, he has no idea what the story is all about" (R. 81). That same teacher described him as having a "poor attention span, time on task and lack[ing] motivation" (R. 86).

- In April 1998 his teacher wrote that "[h]e needs to be motivate[d] to complete assignments" and that he "never completes assignments without...teacher supervision" (R. 70). In May 1999 his teacher wrote that "Ray works very slowly compared to his peers [the other students in the learning disabled class]" (R. 124). In that same report the teacher described how Raymont's desk had been placed between two filing cabinets to "reduce distracting stimuli" and how he had to be provided with structure for all of his academic activities because of his difficulty in working without the teacher's direct supervision (id.).

- Finally, a November 1999 report found that he was "making little to no progress, academically. He is often times reminded to focus because is he a daydreamer and will escape work by all means necessary" (R. 165). That same report noted that his attention span was "very short" and that he was easily distracted (R. 173, 177).

While an ALJ's opinion is not required actually to <u>address</u>

19

every piece of evidence before her (<u>Dixon</u>, 270 F.3d at 1176), she
may not simply disregard significant conflicting evidence in
reaching her decision (<u>Clifford</u>, 227 F.3d at 873). Here there is
substantial evidence of Raymont's problems with concentration,
persistence and pace. Instead of taking that evidence into
account--or articulating a logical reason for discounting it--ALJ
Holtz chose to disregard it, mentioning only the evidence she
viewed as supporting her conclusion. That too was material error.

In the same way, the ALJ ignored relevant information when
she concluded that Raymont had a "less-than-marked" impairment of
cognitive/communicative functioning based on (1) his intelligence
test scores,[12] (2) Dr. Rubens' report and (3) a May 1999 school
report that said Raymont was functioning at a level one year lower
than his actual grade level. That finding flat-out ignores the
bulk of the medical and school evidence that consistently and
repeatedly shows Raymont's reading ability to be three to four
years below his actual grade level (R. 70, 73, 75, 83, 86, 170).
ALJ Holtz erred again when she disregarded that evidence in
reaching her conclusion.

In sum, ALJ Holtz' decision omitted from consideration more
than substantial evidence that was at war with her findings. To
discount that evidence without providing a logical explanation for

---

[12] As the text at n. 9 points out, ALJ Holtz did not
recognize that a learning disability does not depend on, or
require, a low level of intelligence.

her reasoning was improper. And that error provides an additional reason why this case must be remanded for further consideration.

## Conclusion

Even though this opinion has explained at length why the ALJ's opinion was egregiously in error, it is not this Court's place to order the opposite outcome--a final decision in Hicks' favor. Instead neither party has demonstrated entitlement to a judgment as a matter of law, for genuine issues of material fact remain as to Raymont's medical diagnosis, the extent of his impairment and the respective weights that should be accorded to the various medical and school records in assessing whether he medically or functionally meets one of the App. 1 listings. Hence both motions for summary judgment are denied.

But because ALJ Holtz committed extensive errors when she (1) substituted her own lay opinion for medical evidence and (2) failed to consider all of the relevant evidence in reaching her conclusions, Raymont's alternative request for remand in light of this opinion must be and is granted (see Sarchet, 78 F.3d at 309). As a final note, this Court urges Commissioner to transfer this case to another ALJ on remand to ensure a fair review of all of the evidence presented by the record (see id.).

Milton I. Shadur
Senior United States District Judge

Date: March 7, 2002

21

Here is the Listing 112.02 definition of Organic Mental

Disorders:

Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain.  The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

    A.  Medically documented persistence of at least one of the following:

        1.  Developmental arrest, delay or regression; or

        2.  Disorientation to time and place; or

        3.  Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

        4.  Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or

        5.  Disturbance in personality (e.g., apathy, hostility); or

        6.  Disturbance in mood (e.g., mania, depression); or

        7.  Emotional lability (e.g., sudden crying); or

        8.  Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or

        9.  Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or

        10. Disturbance of concentration, attention, or judgment;

AND

B.  Select the appropriate age group to evaluate the
severity of the impairment:

                    *           *           *
          2.  For children (age 3 to attainment of age 18),
     resulting in at least two of the following:

               a.  Marked impairment in age-appropriate
          cognitive/communicative function, documented by
          medical findings (including consideration of
          historical and other information from parents or
          other individuals who have knowledge of the child,
          when such information is needed and available) and
          including, if necessary, the results of
          appropriate standardized psychological tests, or
          for children under age 6, by appropriate tests of
          language and communication; or

               b.  Marked impairment in age-appropriate social
          functioning, documented by history and medical
          findings (including consideration of information
          from parents or other individuals who have
          knowledge of the child, when such information is
          needed and available) and including, if necessary,
          the results of appropriate standardized tests; or

               c.  Marked impairment in age-appropriate
          personal functioning, documented by history and
          medical findings (including consideration of
          information from parents or other individuals who
          have knowledge of the child, when such information
          is needed and available) and including, if
          necessary, appropriate standardized tests; or

               d.  Marked difficulties in maintaining
          concentration, persistence, or pace.